IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00619-PAB-KLM

FRANCO MARTINEZ,
DANA MARTINEZ, and
PAUL GOMEZ, JR.,

      Plaintiffs,

v.

THE CITY OF AURORA,
OFFICER TIMOTHY HUFFMAN,
OFFICER CHRISTOPHER CRUSER,
OFFICER BRAD GRAHAM, and
SERGEANT RANDAL MOODY,

      Defendants.

_____

### ORDER
_____

     This matter comes before the Court on defendants' Motion for Summary Judgment [Docket No. 54].  This Court has subject matter jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  This case arises out of a maneuver used to block a car, referred to as a tactical vehicle contact ("TVC"), conducted by Aurora police officers on a vehicle in which plaintiffs were traveling.

## I. BACKGROUND[1]

     On March 3, 2012, a silver 1995 Infiniti sedan, model J30, bearing Colorado license plate number 522RNX ("the Infiniti"), was observed by Aurora Police

---

[1]The following facts are undisputed unless otherwise indicated.

Department ("APD") officers with improper tags.  Docket No. 54 at 4, Statement of

Undisputed Fact ("SUMF") 1.  The APD officers attempted to stop the Infiniti, at which

time the Infiniti fled from the officers at a high rate of speed.  *Id*., SUMF 2.  The officers

discontinued their attempt to stop the vehicle.  *Id*.  Based on the failed attempt to stop

the vehicle, the APD officers placed an attempt to locate ("ATL") notification for the

vehicle with the APD.  *Id*., SUMF 3.  Two weeks later, on March 17, 2012, plaintiff

Franco Martinez, who is not the registered owner, Docket No. 54-11 at 10, contacted

the APD and reported the Infiniti stolen.  Docket No. 54 at 4-5, SUMF 4.  Officer

Timothy Huffman took a stolen vehicle report from Mr. Martinez on that day.  *Id.,* SUMF

5.  After March 17, 2012, Officer Huffman had no further involvement with any

investigation related to the Infiniti.  *Id*., SUMF 6.  From March 17, 2012 through April 4,

2012, the Infiniti remained listed with the APD as a stolen vehicle.  *Id*., SUMF 7.

On April 4, 2012, Arapahoe County Sheriff's Deputy Kenneth Martinez was

assigned to the East Metro Auto Theft Team ("EMATT").  *Id.*, SUMF 8.  The EMATT is a

multi-jurisdictional task force staffed by members of several different law enforcement

agencies, including the APD.  *Id.*, SUMF 9.  On April 4, 2012, Deputy Martinez observed

the Infiniti at a Shell gas station at 13780 E. 6th Avenue, Aurora, Colorado.  *Id.*, SUMF

10.  Deputy Martinez ran a routine radio clearance on license plate 522RNX, which

showed the vehicle to be stolen.  *Id.* at 6, SUMF 11.  As part of the clearance, Deputy

Martinez learned of the ATL notice placed on the vehicle.  *Id.*, SUMF 12.  Deputy

Martinez notified members of EMATT to respond to assist in contacting the stolen

vehicle.  *Id.*, SUMF 13.  As EMATT officers, including APD Officers Christopher Cruser

and Brad Graham, were responding, the Infiniti left the gas station and traveled several

2

miles.  *Id*., SUMF 14.  Deputy Martinez followed, notifying the EMATT officers via radio of the Infiniti's location on a continuing basis.  *Id*.

As the Infiniti turned eastbound onto 128th Avenue, the other members of the EMATT unit caught up to it.  *Id*., SUMF 15.  Defendant Randal Moody, at that time a sergeant with the APD and supervisor of the EMATT, was in radio contact with the EMATT and was monitoring the circumstances of the contact.  *Id*., SUMF 16.  Sergeant Moody was aware of the fact that the Infiniti had previously eluded APD officers, was the subject of an ATL notification with the APD, and was listed as stolen.  *Id*., SUMF 17.  Based on his training and experience, Sergeant Moody believed that the Infiniti would attempt to flee APD officers as it had done previously, and so directed the application of a TVC maneuver to the EMATT members rather than a traditional traffic stop.  *Id*., SUMF 20.  Sergeant Moody advised the EMATT members that, once it was safe to do so, they were authorized to conduct a TVC.  *Id.* at 7, SUMF 18.[2]

The TVC maneuver was executed by Officer Graham driving his vehicle, an unmarked Chevrolet Tahoe, Docket No. 54-6 at 4-5, in front of the Infiniti, and Officer Cruser positioning his unmarked Dodge Durango, Docket No. 54-4 at 8, behind the Infiniti, and then both vehicles moving together and contacting the Infiniti so that it was "pinned" between the front and rear cars and could not escape.  Docket No. 54 at 7, SUMF 19.  Officers Cruser and Graham were both trained in application of the TVC

---

[2]Plaintiff denies this fact and argues that Sergeant Moody not only authorized the TVC, but that he actually ordered it to be conducted on Mr. Martinez's vehicle.  Docket No. 57 at 6.  However, the Court agrees with the defendants that plaintiffs have not supported their objection with citations to facts in the record.  Therefore, this fact is deemed admitted.  Practice Standards (Civil Cases), Judge Philip A. Brimmer § III.F.3.iv.

maneuver and conducted the TVC in accordance with their training. *Id.*, SUMF 21.

Officers Cruser and Graham positioned their vehicles behind and in front of the

plaintiffs' vehicle, respectively, and slowed down in tandem in order to stop the plaintiffs'

vehicle and execute the TVC. *Id.* at 8, SUMF 24.  Just prior to contact being made

between the Infiniti and the APD vehicles, plaintiff Paul Gomez, the driver of the Infiniti,

slammed on the brakes and shifted the car into reverse. *Id.*, SUMF 26.  Officer Cruser

pulled his vehicle forward into the rear bumper of the Infiniti, as Officer Graham

reversed his vehicle into the front bumper of the Infiniti. *Id.*, SUMF 25.  As Officer

Graham was reversing his vehicle into the front bumper of the Infiniti,[3] he saw the Infiniti

make an abrupt swerve to the right. *Id.*, SUMF 27.  Officer Cruser activated his

emergency lights as soon as he made contact with the Infiniti. *Id.*, SUMF 28.

Once the Infiniti was pinned, EMATT officers emerged from their vehicles and

removed plaintiffs Dana Martinez and Paul Gomez, Jr. from the Infiniti at gunpoint. *Id.*

at 9, SUMF 29.  Plaintiff Franco Martinez was not removed from the Infiniti because he

is a paraplegic. *Id.*, n. 3.  Due to officer safety concerns, it was reasonable for

defendants to remove Ms. Martinez and Mr. Gomez from the Infiniti, which was still

listed as a stolen vehicle, at gunpoint and place the occupants in handcuffs. *Id.*, SUMF

30.  None of the plaintiffs was the registered owner of the Infiniti on April 4, 2012. *Id.*,

SUMF 31.  However, officers determined at the scene that plaintiffs were in lawful

possession of the Infiniti, and they returned it to them at the scene. *Id.*, SUMF 32.

---

[3]The Chevy Tahoe driven by Officer Graham must come to a complete stop before it can be shifted into reverse. *Id.* at 8, SUMF 23.

Sergeant Moody did not arrive on scene until after the TVC had been conducted and the plaintiffs removed from the Infiniti. *Id*. at 10, SUMF 33.

Plaintiffs assert federal claims against the City of Aurora, Sergeant Moody, Officer Huffman, Officer Cruser, and Officer Graham pursuant to 42 U.S.C. § 1983. Docket No. 39 at 5, 7, 8, 10, 11.  Plaintiffs assert a due process claim under the Colorado Constitution against the City of Aurora and a state law negligence claim against Sergeant Moody and Officers Huffman, Cruser, and Graham. *Id*. at 9, 12.

Defendants move for summary judgment on all of plaintiffs' claims. *See* Docket No. 54.  Defendants argue that: (1) none of the defendants are federal government actors, so plaintiffs' fifth amendment claim must fail, Docket No. 54 at 13; (2) the Fourth Amendment, and not the Fourteenth Amendment, governs plaintiffs' § 1983 claims, and thus plaintiffs' Fourteenth Amendment claims must fail, *id*. at 14; (3) Sergeant Moody and Officer Huffman did not personally participate in the alleged Fourth Amendment violation at issue in this case, and thus the Fourth Amendment claims against them must fail, *id*.; (4) Sergeant Moody, Officer Cruser, and Officer Graham are entitled to qualified immunity on plaintiffs' Fourth Amendment claims, *id*. at 16; (5) no constitutional violation by APD occurred, thus plaintiffs' claims against the City of Aurora must fail, *id*. at 22; (6) no cause of action lies under the Colorado Constitution because § 1983 provides an adequate remedy, *id*. at 24; (7) Officer Huffman and Sergeant Moody are entitled to a dismissal of the negligence claim against them because qualified immunity has not been waived, *id*. at 25, 27; (8) Officer Cruser's and Officer Graham's actions were reasonable, and they are therefore are entitled to a dismissal of plaintiffs' negligence claims against them, *id*. at 28.

5

Plaintiffs agree that the Fourth Amendment controls their claims, and thus their federal constitutional claims outside the reasonableness inquiry of the Fourth Amendment should be dismissed.  *See* Docket No. 57 at 3-4.  Plaintiffs also agree with defendants that the City of Aurora is entitled to a dismissal of plaintiffs' fourth claim for relief against the City of Aurora under the Colorado Constitution, *id*. at 5, and this claim does not appear in the Final Pretrial Order.  Docket No. 68 at 4.  Accordingly, the Court will dismiss plaintiffs' fourth claim for relief.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal quotation marks

6

omitted)).  "Once the moving party meets this burden, the burden shifts to the

nonmoving party to demonstrate a genuine issue for trial on a material matter."

*Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir.

1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The nonmoving party

may not rest solely on the allegations in the pleadings, but instead must designate

"specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324;

*see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish,

at a minimum, an inference of the presence of each element essential to the case."

*Bausman*, 252 F.3d at 1115 (citation omitted).  When reviewing a motion for summary

judgment, a court must view the evidence in the light most favorable to the non-moving

party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  ANALYSIS

### A.  Qualified Immunity

Plaintiffs' § 1983 claims against Sergeant Moody, Officer Cruser, and Officer

Graham allege that they violated plaintiffs' Fourth Amendment rights by using excessive

force when seizing the Infiniti.  *See* Docket No. 39 at 10, 11.  In response, Sergeant

Moody, Officer Cruser, and Officer Graham assert the defense of qualified immunity and

argue that their use of a TVC was reasonable and did not violate the Constitution.

Docket No. 54 at 16.

Under the doctrine of qualified immunity, "government officials performing

discretionary functions are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

7

Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008). Under the first prong of the analysis, a plaintiff is required to "establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001)). The determination of whether a violation occurs under the first prong of the qualified immunity analysis turns on substantive law regarding that right. *See, e.g., Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007).

Under the second prong, the plaintiff must show that the constitutional right at issue was "clearly established" at the time of the defendants' alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted). A plaintiff need not identify "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011). "[C]ontrary authority from other circuits does not preclude a finding that the law in this circuit was clearly established, if the contrary authority can be distinguished." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).

"If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995). The Court may exercise its discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson,* 555 U.S. at 236.

### 1. *Violation of a Clearly Established Right*

The Fourth Amendment is not a guarantee against all seizures, just unreasonable seizures. *United States v. Sharpe*, 470 U.S. 675, 682 (1985). "[A]*ll* claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).

To determine "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment," a court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Proper application of the Fourth Amendment's reasonableness standard to an excessive force case focuses on three, non-exclusive factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). *See also Saucier*, 533 U.S. at 195 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.").

Regarding the first *Graham* factor, the severity of the crime, defendants argue that, pursuant to Colo. Rev. Stat. § 18-4-409, auto theft is a class 4 felony that carries a maximum fine of $500,000 and a potential prison sentence of up to six years. Docket No. 54 at 20, n. 6.[4] The Court agrees with defendants that auto theft is a serious crime.

Regarding the second *Graham* factor, whether the suspect poses an immediate threat, defendants argue that "the history of the vehicle and its status as stolen provided a reasonable basis for the [d]efendants to believe that the occupants might attempt to evade arrest by flight or otherwise frustrate efforts to detain them," thereby increasing the danger to the police officers as well as the public. Docket No. 54 at 20. The Court agrees with defendants that the suspect, namely, the person in control of the Infiniti at the time it left the gas station, posed an immediate threat to the safety of the officers or others. The fact that the driver, Mr. Gomez, turned out to have been in lawful possession of the Infiniti and turns out not to have posed a threat to the officers, is

---

[4]Plaintiffs cite the *Graham* factors, but do not address defendants' arguments regarding them. *See* Docket No. 57 at 12.

irrelevant.  A reasonable officer with Sergeant Moody's training and experience, knowing that driver of the vehicle on March 2, 2012 had eluded officers at high speed and knowing that the vehicle was reported as stolen, would reasonably conclude that the person in control of the Infiniti on April 4, 2012 posed an immediate threat to the safety of the officers and others.  *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (finding defendant police officer "could reasonably conclude that the driver posed an immediate threat to the safety of the officers and the public–a driver caught with a stolen vehicle has a strong incentive to evade arrest, given the seriousness of the crime.").  Reasonable officers in the position of Officers Cruser and Graham, hearing Sergeant Moody's advisement, would similarly conclude that the driver of the Infiniti posed a threat.  Thus, defendants have established the second *Graham* factor.

Regarding the third *Graham* factor, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, defendants do not directly address it.  This factor favors plaintiffs.  There is nothing in the record to suggest that plaintiffs were "actively" resisting arrest.  Both police vehicles used in the TVC were unmarked and there is no evidence that plaintiffs were aware that they were being pursued by police until after the TVC occurred.  Accordingly, after application of the *Graham* factors, the Court finds that two of the three factors favor defendants.

The *Graham* factors are not exclusive considerations.  *See Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).  Accordingly, the Court will consider the additional arguments plaintiffs offer to support their position that defendants' conduct was not objectively reasonable.  Plaintiffs argue that the police officers should have executed the vehicle stop differently, in particular that they should have conducted a

felony stop instead of a TVC.  *See* Docket No. 57 at 13-16.  However, the Fourth

Amendment "does not require [police] to use the least intrusive means in the course of a

detention, only reasonable ones."  *Marquez v. City of Albuquerque*, 399 F.3d 1216,

1222 (10th Cir. 2005) (internal quotations omitted).  Plaintiffs also argue that defendants

should have conducted surveillance to determine their identities and thereby assess

their dangerousness.  Docket No. 57 at 13-14.  Plaintiffs do not explain how, through

additional surveillance, police would have been able to determine plaintiffs' identities or

assess their dangerousness.  Moreover, plaintiffs have not shown that the surveillance

conducted by the police was unreasonable or deficient.  The Court finds that reasonable

officers in defendants' position, having received notification of a stolen vehicle and an

ATL, would conclude that no additional surveillance was necessary before attempting to

stop the Infiniti.

　　　　Plaintiffs argue that a TVC was unreasonable based on excerpts from the

EMATT manual.  Docket No. 57 at 14, 16, 17.  The EMATT manual states: "EMATT

members will not attempt to initiate tactical vehicle contact on a moving vehicle."

Docket No. 57-1 at 5.  However, "violation of a police department regulation is

insufficient for liability under section 1983" for excessive force.  *Wilson v. Meeks*, 52

F.3d 1547, 1554 (10th Cir. 1995), *abrogated on other grounds by Saucier*, 533 U.S. at

205; *Marquez*, 399 F.3d at 1222 (citing *Romero v. Board of County Comm'rs*, 60 F.3d

702, 705 (10th Cir. 1995)).

　　　　Plaintiffs assert that the TVC was inherently unreasonable because, among other

things, it involved the use of deadly force.  Docket No. 57 at 16-17.  Plaintiffs claim the

vehicles involved in the TVC were going approximately 30-40 miles per hour before the

TVC occurred and that Officer Graham's vehicle was traveling in reverse at approximately 20-30 miles per hour at the time of contact.  *Id*. at 17-18.  But plaintiffs do not address the speed plaintiffs' vehicle was traveling at the time of contact.  It is undisputed that Officer Graham's vehicle must have come to a complete stop before Officer Graham shifted it into reverse.  Docket No. 54 at 8, SUMF 23.  It is also undisputed that Mr. Gomez slammed on the brakes and shifted the Infiniti into reverse shortly before impact.  *Id*., SUMF 26.  In his deposition, Mr. Gomez states that he was "[n]ot [going] very fast in reverse.  10, 5 miles an hour.  I don't know."  Docket No. 54-16 at 37.  Thus, plaintiffs' argument that a TVC conducted at 30-40 miles per hour is inherently unreasonable is inapplicable to these facts.  As a result, there is no basis to find that defendants used deadly force in conducting the TVC.  Moreover, in terms of the damage caused to the Infiniti by the impact, given the rapidly evolving circumstances, particularly the Infiniti's sudden stop, the Court finds that plaintiffs have not shown that the TVC, as conducted, was objectively unreasonable.  To reach an opposite conclusion would require second-guessing the officers' "on-the-ground decision using the benefit of 20/20 hindsight."  *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011).

Viewing the facts in a light most favorable to plaintiffs, the Court finds that plaintiffs have not shown a genuine dispute of material fact as to whether Sergeant Moody's, Officer Cruser's, and Officer Graham's actions were objectively reasonable given what was known to them at the time of the TVC.  Plaintiffs have failed to satisfy their burden under the first prong of the qualified immunity analysis, and their § 1983 claims against Sergeant Moody, Officer Cruser, and Officer Graham fail.  In light of the

13

Court's finding that plaintiffs have failed to show that the TVC violated their constitutional rights, plaintiffs' § 1983 claim against Officer Huffman also fails.

### 2. Violation of Clearly Established Law

Although the fact that plaintiffs have failed to establish the first prong of the qualified immunity analysis is dispositive, the Court will briefly address the second qualified immunity prong.  To satisfy this prong, plaintiffs "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant[s'] actions were clearly prohibited." *Trotter v. Regents of the Univ. of N.M.*, 219 F.3d 1179, 1184 (10th Cir. 2000) (quotations omitted).  The question is whether case law existing on April 4, 2012 would alert a reasonable officer that, when faced with a vehicle reported as stolen and which had previously evaded law enforcement at a high rate of speed, the use of a TVC would constitute excessive force.

Plaintiffs have not identified any case directly addressing the use of a TVC.  Moreover, plaintiffs fail to cite any case with analogous facts that would have put defendants on notice that a TVC would constitute excessive force.  Rather, plaintiffs offer an attenuated argument that a TVC constitutes "deadly force," Docket No. 57 at 17, and rely on *Garner* for the proposition that "the use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."  471 U.S. at 25 (citation omitted); Docket No. 57 at 19.  This argument does not address the aforementioned question–whether there was case law available to the officers at the time of the TVC that would put them on notice that their conduct might constitute excessive force.

In *Scott v. Harris*, the plaintiff led police on a high-speed chase while fleeing from an attempted traffic stop.  550 U.S. 372, 374-75 (2007).  After plaintiff entered a shopping center parking lot and was nearly boxed in, he evaded police by making a sharp turn, colliding with a police car, and speeding down a two-lane highway.  *Id*. at 375.  Defendant police officer pursued plaintiff and decided to initiate a "Precision Intervention Technique ('PIT') maneuver, which causes the fleeing vehicle to spin to a stop."  *Id*.  Applying *Garner*, the Supreme Court found defendant's application of a PIT maneuver to terminate the police chase reasonable.  *Id*. at 386.

A PIT maneuver involves contacting a vehicle while it is moving and causing the impacted vehicle to lose control, unlike a TVC, which brings a vehicle to a controlled stop in between two police vehicles.  A reasonable police officer reading the Supreme Court's *Scott* decision would not conclude that, in a situation like that presented to defendants, a TVC would constitute excessive force.

In *Walker v. Davis*,  649 F.3d 502 (6th Cir. 2011), the Sixth Circuit denied qualified immunity to a police officer who rammed a motorcyclist, causing his death.  There, the motorcyclist fled from the police after an attempted traffic stop for speeding.  *Id*. at 503.  After the motorcyclist turned off road, the police officer intentionally rammed the motorcycle in order to stop it, throwing the motorcyclist from the motorcycle, dragging him underneath the police cruiser, and crushing him to death.  *Id*.  The *Walker* court found the circumstances to be distinguishable from *Scott* because the motorcyclist "posed no immediate threat to anyone as he rode his motorcycle across an empty field in the middle of the night in rural Kentucky" and the fact that, unlike *Scott*, the police cruiser rammed a motorcycle, noting that "[i]t is only common sense–and obviously

15

so–that intentionally ramming a motorcycle with a police cruiser involves the application

of potentially deadly force." *Id*. at 503-04.  Ramming a motorcycle on a dirt road is

unlike a TVC, in which two police vehicles pin a four-wheeled vehicle from the front and

rear.  The Court finds that *Walker* is not on point regarding TVCs and would not put a

reasonable police officer on notice that conducting a TVC in the circumstances

presented in this case would constitute excessive force.  Moreover, *Walker* is an out-of-

circuit case.  *See Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007) ("[F]or a

right to be clearly established, 'there must be a Supreme Court or Tenth Circuit decision

on point, or the clearly established weight of authority from other courts must have

found the law to be as the plaintiff maintains.'") (citation omitted).

Plaintiffs have therefore failed to carry their burden under the second prong of

the qualified immunity analysis, which provides an additional basis on which to deny

their claims against Sergeant Moody and Officers Cruser, Graham, and Huffman.

## B.  Official Capacity/*Monell* Claims

The Court turns to plaintiffs' claims against the City of Aurora and Sergeant

Moody in his official capacity, which, under § 1983, is considered a suit against

Sergeant Moody's employer, the City of Aurora.  *Monell v. Dep't of Soc. Servs. of N.Y.*,

436 U.S. 658, 690 (1978).  Although entities such as the City of Aurora do not enjoy the

benefits of qualified immunity, plaintiffs have failed to show, for the reasons noted

above, that defendants' conduct rose to the level of a constitutional violation.  *See City*

*of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Myers v. Okla. Cty. Bd. of Cty.*

*Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) (holding that plaintiff asserting

municipal liability claim must prove that a municipal employee committed a

16

constitutional violation). As such, the Court finds that defendants are entitled to summary judgment on plaintiffs' § 1983 claims against the City of Aurora and Sergeant Moody in his official capacity.

### C. Remaining State Law Claims

Having dismissed plaintiffs' claim arising under federal law, the Court next addresses the issue of whether it should exercise supplemental jurisdiction over plaintiffs' remaining claims, which are based upon state law. While courts may exercise supplemental jurisdiction over state law claims if there is otherwise a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) states that a court may decline to exercise jurisdiction over such claims if "the district court has dismissed all claims over which it has original jurisdiction." When § 1367(c)(3) is implicated in the Tenth Circuit, courts are advised to dismiss pendent state law claims "absent compelling reasons to the contrary." *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (reversing the district court's grant of summary judgment on state law claims); *Endris v. Sheridan Cty. Police Dep't*, 415 F. App'x 34, 36 (10th Cir. 2011) ("any state-law claims for assault and battery or mental and emotional injury were inappropriate subjects for the exercise of pendent jurisdiction where all federal claims had been dismissed"). *But see Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 79 (10th Cir. 2011) (finding no abuse of discretion in trial court's decision to retain jurisdiction over state law claims after plaintiff voluntarily dismissed claims arising under federal law). Finding no compelling reason here to retain jurisdiction, the Court will dismiss plaintiffs' remaining claims without prejudice. *See* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced within the

17

statute of limitations to be re-filed if involuntarily dismissed because of lack of

jurisdiction); *Dalal v. Alliant Techsystems, Inc.*, 934 P.2d 830, 834 (Colo. App. 1996)

(interpreting 28 U.S.C. § 1367(d) as tolling the statute of limitations while claim is

pending in federal court); *see also City of Los Angeles v. Cty. of Kern*, 328 P.3d 56 (Cal.

2014) (noting that interpretations of § 1367(d) vary between jurisdictions).

## IV.  CONCLUSION

For the foregoing reasons it is

**ORDERED** that defendants' Motion for Summary Judgment [Docket No. 54] is

**GRANTED** in part.  It is further

**ORDERED** that plaintiffs' seventh claim for relief is **DISMISSED** without

prejudice.  It is further

**ORDERED** that judgment shall enter in favor of defendants and against plaintiffs

as to plaintiffs' first through sixth claims for relief.  It is further

**ORDERED** that, within 14 days of the entry of this Order, defendants may have

their costs by filing a Bill of Costs with the Clerk of the Court.  It is further

**ORDERED** that the January 15, 2016 Trial Preparation Conference and the

February 1, 2016 Trial are **VACATED**.  It is further

**ORDERED** that this case is dismissed in its entirety.


DATED January 8, 2016.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge